IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

A&C CATALYSTS, INC.,

    Plaintiff and Counter-Defendant,

v.

RAYMAT MATERIALS, INC.,

    Defendant and Counter-Plaintiff.

/

No. C 14-04122 WHA

**OMNIBUS ORDER RE *DAUBERT* MOTIONS AND MOTIONS *IN LIMINE***

**1.  RAYMAT'S MOTION RE EXPERT REPORTS OF DR. GARY HUVARD.**

Dr. Huvard signed opening and rebuttal expert reports. He holds a Ph.D. in chemical engineering with thirty-five years of experience in developing and commercializing chemical, pharmaceutical, and polymer processes. In his ten-page opening expert report, he opined that the eleven-page document Raymat provided A&C Catalysts was "wholly unacceptable for the purpose of transferring adequate and, in our professions, a commonly expected level of knowledge on the manufacturing of lauroyl lysine." He opined that the phrases "technology transfer package," "manufacturing process," and "chemical operation export instrument" all referred to the same thing, "a detailed written description of how the chemical production facility is constructed and operated to produce a product that is subject to a variety of quality and regulatory constraints." As an "example," he appended to his opening expert report a 25-page document from Japan (in English), currently available on the website for the National Institute of Health Sciences in Japan, titled "Guideline for Technology Transfer." In his rebuttal expert report, he criticized portions of Raymat's expert report, relied on a Canadian definition of "technology transfer," and pointed to internet reports of an unrelated Honeywell deal. He also opined (Dkt. No. 66-1 at 5) (footnotes omitted):

> Based on common practice, A&C had every right to assume that the phrase "manufacturing process" included some of the equipment or, at the very least, a detailed description of the equipment used. A&C was asked to invest in equipment and told that all of the equipment needed to scale up lauroyl lysine production to three tons per month would cost $150,000. Given this and earlier requests for sums of $25,000 for equipment, it was very reasonable for A&C to expect that equipment was part of the settlement purchase price. One might argue in the present case that the sale price of $150,000 is rather low if the plant equipment was to be included in the sale. This is not necessarily correct. For example, one of the larger reactors discussed in Raymat's manufacturing report was described as having a capacity of 3000 Liters (about 750 gallons).

Dr. Huvard's rate was $350 per hour, increased to $450 per hour for depositions and trial.

During the deposition of Dr. Huvard, the following occurred when questioned by counsel for Raymat (Huvard Dep. 84, Dkt. No. 66-4) (emphasis added):

> Q.  . . . What I'm interested is about your opinion, sir, okay? Sitting here today, sir, do you have opinion or not whether A&C purchased any equipment through the settlement agreement?
>
> A.  I have no opinion on that. I was not asked to form an opinion on that, and I have not formed an opinion on that. All I have formed an opinion in – and, in fact, it is not an opinion; it's a simple fact – is that the statement made by Dr. Goldstein [Raymat's expert] in his report that equipment transfers was never part of any process technology transfer, that statement is incorrect. That's all I'm testifying to. That's the only fact that I'm testifying to. That statement is incorrect.
>
> Q.  As an expert in this field – I know you were not asked to do that, but I'm asking you to do that now – if you read the settlement agreement, do you have any opinion whether or not that purchase of – by $150,000 included equipment?
>
> A.  Are you asking me if I want to be an expert witness for you?
>
> Q.  No. I'm asking you whether you have an opinion?
>
> A.  *I have no opinion on any of that unless I'm hired to have an opinion on it, sir.*
>
> Q.  I'm asking you whether, as an expert, you have any understanding of that phrase?
>
> A.  As an expert, I understand all of it.
>
> Q.  Yes.
>
> A.  *But I have no opinion on any of it unless I'm paid to have an opinion.*

1  Q. Well, I'm asking you the question. Are you going to answer it?

2  *A. I'm a mercenary. I will not answer the question unless I'm paid
3  to answer the question. I was not hired to answer that question.
   I was hired to answer a simple question.*

4  Raymat then filed a *Daubert* motion. Raymat's motion is **GRANTED IN PART AND**
5  **DENIED IN PART**.

6  *First*, Dr. Huvard should never have refused to answer proper questions posed during his
7  deposition. Raymat was entitled to examine Dr. Huvard on the opinions stated in his rebuttal
8  expert report. Raymat may try to admit at trial the aforementioned testimony for purposes of
9  impeachment.

10  *Second*, Dr. Huvard is precluded from testifying about any opinions based on the random
11  document drafted by strangers to this litigation in Japan. Also, he should not get into the
12  definition of "technology transfer" stated in a Canadian document and the internet report of an
13  unrelated Honeywell deal.

14  *Third*, as stated at the hearing, A&C Catalysts cannot use Dr. Huvard's deposition
15  testimony taken by opposing counsel in lieu of testimony in person. This would be unfair. If he
16  is tendered as a witness, he must appear in person.

17  At an expert deposition, counsel in Raymat's position ordinarily would not cross-
18  examine the expert on every point that counsel would bring up on cross-examination at trial.
19  Instead, depositions of experts are more selective and strategic. It is not unusual for counsel to
20  limit the deposition examination to pinning down ambiguation in the Rule 26 report without
21  trying to impeach on the spot. In fact, one purpose of such depositions is to flesh out the story so
22  that *after* the deposition, counsel can further investigate and be able to impeach the fleshed-out
23  story at trial.

24  For the proponent of a witness to seek to rest upon the fleshed-out version of the story at
25  deposition and to avoid cross-examination at trial is unfair.

26  Beyond this, direct testimony at trial is limited to what was timely disclosed in the expert
27  report. Even if examination by opposing counsel went beyond the four corners of the report in
28  deposition, that cannot be received into evidence on direct testimony at trial. This is a long-

3

standing practice stated in the undersigned judge's orders designed, in part, to encourage counsel to make sure their disclosures are forthcoming. Accordingly, expert testimony herein must be in person.

**2. RAYMAT'S MOTION RE EXPERT REPORT OF DR. DAVID DODDS.**

Raymat's motion to exclude the expert report of Dr. David Dodds is **DENIED**.

Dr. David Dodds signed an opening expert report. He holds a Ph.D. in organic synthesis with experience in the area of pharmaceutical and chemical manufacturing. In his twelve-page report, he opined based on his "experience in the field and [as one] skilled in the art," that "to reasonable industrial standards," the eleven-page document provided by Raymat did not meet the requirements of documentation "for the purpose of transferring a manufacturing process from one party to another and allowing the continuation of the business of manufacturing Lauroyl Lysine for commercial sale." His rate was $570 per hour.

Raymat moves to exclude Dr. Dodds' report and testimony based on (1) his failure to consider "sufficient facts," including that Raymat did not own the Yantai plant in China, and (2) his "unreliable methodology." That is, Dr. Dodds opined about what a document for a "manufacturing site transfer" would require, whereas in Raymat's view, it had no obligation to transfer all of the manufacturing details that would allow A&C Catalysts to recreate the plant in Yantai.

A&C Catalysts responds that Dr. Dodds was not required to accept Raymat's "version of contested facts" and Dr. Dodds' insight into the "usage of trade and the industry standards for transfer of a chemical manufacturing process" based on his experience will be helpful to the trier of fact (Opp. 1).

Raymat's attack goes to the weight, not admissibility, of Dr. Dodds' opinions. Accordingly, Raymat's motion is **DENIED**.

**3. A&C CATALYSTS' MOTION RE EXPERT REPORT OF DR. WALTER GOLDSTEIN.**

A&C Catalysts' motion to exclude the expert report of Dr. Walter Goldstein is **GRANTED IN PART AND DENIED IN PART**.

4

1    Dr. Goldstein signed a rebuttal expert report.  He holds a Ph.D. in chemical engineering
2 and a MBA.  He has over fifty years of experience in "science and engineering," including
3 experience developing and overseeing chemical and biochemical processes.  In his nine-page
4 report, he opined that Raymat's eleven-page document was "perfectly acceptable" and that
5 "[t]here isn't any evidence that conveying anything else such as equipment was intended or
6 agreed to by the parties."  His rate was $350 per hour, increased to $475 for testimony.

7    During deposition, Dr. Goldstein was asked who drafted portions of his report.  He stated
8 (Goldstein Dep. 57–58, 62–63, Dkt. No. 67-3):

> Q.  You did author this list [of materials reviewed], right?
>
> A.  Yes, of course.
>
> Q.  You authored it?
>
> A.  I authored it but materials were provided to me from Dr. Li's [Attorney for Raymat] office and those are the materials I read. And that's the list of -- of documents that I read in order to -- to write my report so . . .
>
> Q.  But this list did you author this list?
>
> A.  I didn't author this list.  But it came from me.  Dr. Li [Attorney for Raymat] kind of acted as my legal secretary on this. I didn't have all this information.  It was sent to me.  And they provided a template and it listed the things that had been sent to me and that -- one of those I'm -- I'm assuming or expecting is the testimony that that Dr. Lin [sic] gave.
>
> *      *      *
>
> Q.  Did you type any aspect of this reference list?
>
> A.  No.
>
> Q.  Let's turn to your report well, other than this reference list which you say you didn't type are there other parts of the report that you didn't type?
>
> A.  I was provided -- there were other parts I didn't type directly, no.
>
> Q.  Were you provided like a rough draft?
>
> A.  I was provided a template.
>
> Q.  And that template already had language in it?
>
> A.  It had language in it for me to review.

5

       Q.  And so you reviewed that language and then did you edit it?

       A.  Yes.  I edited it.  Plus I added my own where I wanted to.  It's my report.  I wanted it to be correct.

A&C Catalysts moves to exclude Dr. Goldstein's report and testimony because (1) he is not qualified to be an expert in the area of "sale or transfer of a chemical manufacturing process," (2) Raymat's attorney was the ghostwriter of the report, (3) Dr. Goldstein cannot opine about the parties' subjective intentions about the terms of the settlement agreement, and (4) Dr. Huvard found flaws with Dr. Goldstein's analysis.

In opposition, Raymat responds that counsel acted as a "legal secretary — by providing sufficient facts and documents to the expert, by explaining the legal issues of the case, and by providing secretarial support."  Nonetheless, Raymat argues that Dr. Goldstein formed his opinions based on the facts provided and his experience in the field.

A&C Catalysts' general attack on Dr. Goldstein's qualifications is rejected, but Dr. Goldstein cannot testify as to the parties' subjective intent for the settlement agreement. He lacks personal knowledge of that intent.  That Raymat's counsel may have served as a ghostwriter for portions of the report will not alone disqualify Dr. Goldstein, but this may be used to impeach Dr. Goldstein at trial.  Moreover, the following statements are hereby **STRICKEN** from Dr. Goldstein's report (Goldstein Rep. 4, 7–9):

> The fact that A&C knew the Yantai plant, which made LL for Raymat, was not owned by Raymat also makes it highly unlikely that A&C was expecting to buy the LL manufacturing equipment from Raymat, as A&C knew Raymat did not own the equipment.

       *       *       *

> Based on my own experience, if I were in A&C's position, when I received the manufacturing process, I would first pay the $150,000 as required by the settlement agreement.

       *       *       *

> The parties in this case seem to have more or less anticipated the kind of processes as I described above, as shown by the 8 hours free consulting time included in the purchasing price and by the negotiation on the price for Dr. Lin's introduction of A&C to the Yantai plant.  It was clear that the parties knew that the manufacturing process documentation would not contain sufficient details to enable A&C to design and operate its production line for LL, hence the consultation requirement and the optional visits to the

> Yantai plant. This is the typical kind of arrangements for transferring a manufacturing process. The consulting time and plant visits are meant to fill in the details that the manufacturing process documentation lacks. The settlement agreement does not say that Raymat must provide the detailed implementation documents. Thus, I see no reason why Raymat should be required to provide such implementation documents that are by no means a necessary part of the documentation for manufacturing process. Further, many of the implementation documents could have been created according to the Process Document, possibly within the 8 hours of consulting time, during the iterative process of plant design that I described above.

\*          \*          \*

> There isn't any evidence to indicate that conveying anything else such as equipment was intended or agreed to by the parties.

Dr. Goldstein will be able to testify as to relevant opinions based on his experience and knowledge of customs in the field. For example, he can opine that "[i]n the world of manufacture [sic], it is inappropriate for one to use the phrase 'manufacturing process' to cover both the process and the equipment" and that a "chemical engineer assigned the task of specifying equipment to make the LL product would use [Raymat's eleven-page document] as the basis to carry out his or her engineering analysis and specify equipment and layout in consultation with vendors and in a manner that fits (and is germane) to his company's facility, utilities, resources, etc." (Goldstein Rep. 3, 5, Dkt. No. 69-1).

\*          \*          \*

In sum, the experts may testify as to customs and usage in practice based on their experience in the relevant field and as ones skilled in the art, as disclosed in their expert reports. They cannot, however, speculate as to the intent of the parties and cannot testify on matters for which they lack personal knowledge.

\*          \*          \*

7

**4.     RAYMAT'S MOTIONS *IN LIMINE*.**

For the reasons stated at the hearing, Raymat's motion *in limine* number 1 is **DENIED**. Raymat's motion *in limine* number 2 is **DENIED**. Raymat's motion *in limine* number 3, which was largely unopposed, is **GRANTED**.

**IT IS SO ORDERED.**

Dated:   December 12, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE