**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

A&C CATALYSTS, INC.,

           Plaintiff and Counter-Defendant,

  v.

RAYMAT MATERIALS, INC.,

           Defendant and Counter-Plaintiff.

————————————————————————/

No. C 14-04122 WHA

**FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR RELIEF FOLLOWING BENCH TRIAL, AND REFERRAL TO DEPARTMENT OF JUSTICE**

**INTRODUCTION**

This order resolves this satellite litigation over a settlement agreement that blew up. This order includes the findings of fact and conclusions of law following a three-day bench trial.

**FINDINGS OF FACT**

1. N'-Lauroyl-L-lysine ("LL") is a chemical derivative of the amino acid L-lysine. LL is a powder used in the personal-care industry, including in cosmetics.

2. At all material times, Raymat Materials, Inc. was a supplier of chemical products, including LL. Dr. Jibing Lin was the president and Jim Turner was the director of sales and marketing. Dr. Lin is a chemist with a Ph.D. in organic chemistry.

3. At all material times, A&C Catalysts, Inc. was a distributor and manufacturer of chemical products. It did not, however, manufacture LL. Abraham Goldstein was the president of A&C Catalysts and John Wolfe was the director of sales and marketing at Daryalabs, Inc., which was owned by A&C Catalysts.

4. At all material times, Ajinomoto Co., Inc., located in Japan, and Raymat were the only two suppliers of LL on a commercial scale.

United States District Court
For the Northern District of California

5.      Ajinomoto previously held the rights to a LL patent, now expired.  Dr. Lin

(Raymat) spent six months in the lab and ten months scaling up the LL manufacturing process

based, in part, on the Ajinomoto patent.

6.      In 2008, A&C Catalysts refused Raymat's offer to jointly invest money in a plant

in China to make LL.  Raymat nevertheless went ahead and made arrangements with Yantai

Justaware Pharmaceutical Co., Ltd., located in Yantai, China ("the Yantai plant") to manufacture

LL.  The Yantai plant became Raymat's contract (or "toll") manufacturer.  Nevertheless, there

was no written agreement between Raymat and the Yantai plant, only a "handshake agreement"

for Yantai's manufacturing of LL for Raymat.

7.      Even though Dr. Lin spent "weeks and weeks" at the Yantai plant "debugging the

[LL] production problems," Raymat had (and has) no ownership in the Yantai plant.  Nor did (or

does) Raymat own any of the equipment at the Yantai plant.  The Yantai plant stopped producing

LL in 2012.  Raymat continued to sell LL from its inventory.

8.      In 2013, Raymat sued A&C Catalysts regarding an exclusive supply agreement,

wherein Raymat had agreed to sell LL exclusively to A&C Catalysts so long as A&C Catalysts

met certain minimum purchases.  *Raymat Materials, Inc. v. A&C Catalysts, Inc.*, No. 13-567

(N.D. Cal.).  A&C Catalysts filed counterclaims and a third-party complaint against Protameen

Chemicals, Inc.  Protameen was a distributor of chemical products, including LL.

(Protameen, however, is not a party to this satellite litigation.)

9.      In the original litigation, Raymat designated as "Highly Confidential – Attorney's

Eyes Only" the formal name of the Yantai plant and the name of the contact person at the plant.

Both names were referenced in the deposition of Dr. Lin taken by counsel for A&C Catalysts.

Counsel for A&C Catalysts then filed a public declaration, dated April 13, 2014, which stated

(TX 19) (internal citations omitted; emphasis added):

> During the March 17, 2014 deposition of Jibing Lin of Raymat,
> ***A&C learned (1) that Raymat does not manufacture Lauroyl
> Lysine itself, but instead contracts with a manufacturing facility
> in China for all of its Lauroyl Lysine production, and has no
> ownership in that manufacturing facility***; (2) the name of that
> manufacturing facility; and (3) that Mr. Lin had a "handshake deal"
> with that manufacturing facility for production of Lauroyl Lysine,

United States District Court

For the Northern District of California

1   and had a written contract with another manufacturing facility in
2   China for production of Lauroyl Lysine, which Raymat has not
    produced to A&C.

3   In other words, A&C Catalysts knew of the plant in China but did not know the formal name of

4   the plant until later.

5       10.     On May 29, 2014, the parties and their counsel appeared for a settlement

6   conference before our Magistrate Judge Donna Ryu.  At the settlement conference, key

7   negotiations occurred party-to-party without the presence of counsel, because Attorney James Li

8   was counsel of record for both Raymat and Protameen and possibly had a conflict.  Jibing Lin and

9   Jim Turner negotiated on behalf of Raymat, and Abraham Goldstein and John Wolfe negotiated

10  on behalf of A&C Catalysts.

11      11.     In pertinent part, A&C Catalysts proposed that Raymat leave the LL business with

12  the idea that A&C Catalysts would manufacture LL in its New Jersey plant.  Raymat responded

13  that if it were to leave the LL business, A&C Catalysts should buy its "LL manufacturing

14  process."  Both sides understood this as a reference to the manufacturing process used at the

15  Yantai plant to make the type of LL Raymat had been selling to A&C Catalysts.

16      12.     Mr. Lin further offered to introduce Mr. Goldstein to the Yantai plant during a

17  three-day trip to China for the price of $25,000 plus travel expenses (although this offer was not

18  made part of the settlement agreement and the offer was never acted upon or accepted).

19      13.     During the settlement negotiations, "production records," "plant records," "batch

20  sheets," "quality control records," and a "list of equipment" were never mentioned.  The LL

21  "production records" at the Yantai plant were voluminous, numbering in the thousands of pages.

22      14.     Magistrate Judge Ryu then placed the settlement terms between A&C Catalysts

23  and Raymat on the record, all of which is now reproduced (TX 20):

24          These two appearing parties have also reached a settlement
            agreement in this case in full resolution of the claims between
25          the two parties.  I'm going to state the material essential terms of
            the agreement and have the parties give their agreement on the
26          record.  Once they do, these parties are fully bound by the terms
            and the terms are fully enforceable.  *It doesn't matter whether*
27          *the parties end up reducing this to writing.*

28          So here are the material essential terms of the agreement
            between Raymat and ACC.  The parties agree to dismiss all

3

**United States District Court**
For the Northern District of California

1    claims against each other in this action, with prejudice.  The
     parties agree to a mutual release of all claims against each other,
2    known and unknown, including a waiver of California Civil
     Code 1542.  However, this release does not extinguish Raymat's
3    obligation, or Raymat's counsel's obligation, to pay fees to ACC
     as ordered by Judge Alsup in docket number 110 in this case.
4    The parties agree that the terms of this agreement are
     confidential and it can only be shared with their legal and
5    financial advisors.

6    ***Raymat and Doctor Lin agree to leave the LL business entirely
     and worldwide for a period of ten years.  Raymat and Doctor***
7    ***Lin cannot operate LL business through any subsidiary or
     shadow company during that time, including but not limited to,***
8    ***working with the Yantai plant to produce LL, or to introduce
     anyone to the LL business using the Yantai plant***.

9
     ***Raymat and Doctor Lin cannot disclose the LL manufacturing***
10   ***process to anyone during this ten-year period, except for ACC***.
     If Raymat or Doctor Lin violate the ten-year ban, then ACC can
11   sue them for breach of contract with a liquidated damage clause of
     $2,000,000.  If such a breach of contract is pursued, the prevailing
12   party shall be entitled to seek reasonable attorney's fees.

13   ACC agrees to purchase Raymat's remaining LL inventory,
     which is estimated to be 7200 kilograms, at a price of $41.80 per
14   kilogram, which is the same price that was provided by Raymat
     to Protameen.  This comes to a total of $300,960, which ACC
15   will put in an escrow account by June 6, 2014.  Raymat will ship
     the remaining LL inventory product to ACC within one week of
16   notification that the proceeds are in escrow.  After receipt of the
     product ACC will have seven business days to reject any LL
17   product due to non-conforming quality.  If no rejection of
     product takes place during that time, the escrow funds will then
18   be wired to Raymat, per Raymat's wire instructions.

19   ***In addition, ACC will pay $150,000 to Raymat to purchase***
     ***Raymat's LL manufacturing process, along with***
20   ***documentation of that process, in both English and Chinese, as
     well as eight hours of support time for teleconferencing with***
21   ***Doctor Lin***.  The manufacturing process will be provided to
     ACC by no later than August 29th, 2014 and ACC will pay
22   Raymat the $150,000 by no later than August 29th, 2014.

23   With respect to the settlement agreement, ***if either party pursues
     an action to enforce the settlement contract, the prevailing party***
24   ***shall be entitled to reasonable attorney's fees.***  And I should
     correct my earlier statement about attorney's fees having to do
25   with an action for breach of contract if Raymat or Doctor Lin
     violates the ten-year bar.  Let me restate that in the same way that
26   if such an action for breach of contract takes place, then the
     prevailing party shall be entitled to reasonable attorney's fees.

27

28   The bolded sentences were not bolded in the transcript, of course, and the bolding above is only

     to alert the reader to passages of interest in resolving this dispute.

4

**United States District Court**
For the Northern District of California

15.     The parties then agreed on the record to be bound by the settlement agreement. A stipulation of dismissal was filed and the file was closed.

16.     In August 2014, A&C Catalysts transferred $150,000 to its counsel to hold "in escrow."

17.     From May 29 to August 25, 2014, A&C Catalysts never inquired to Raymat about equipment.

18.     Counsel for A&C Catalysts then sent counsel for Raymat the following email, dated August 25, 2014, which stated in relevant part (TX 211) (emphasis added):

> I wanted to inform you that pursuant to the settlement terms reached between the parties in the above-captioned matter, I have received and deposited $150,000 into my escrow account as consideration for the sale of the process and technology for LL from Raymat.
>
> Kindly call me to discuss the protocol for transferring *the process equipment, technology and all documents to AC&C* and in return payment of the $150,000.00 to Raymat.

Counsel for Raymat responded (TX 211) (emphasis added):

> We have the manufacture protocols in both Chinese and English. I will send you the protocols in a separate email.  After that, we expect you to release the $150,000 to Raymat.  After Raymat receives the money, and after Mr. [Abraham] Goldstein and his technical staff review the protocol, Jibing [Lin] will give your client 8 hours consultation that are included in the $150,000 payment.
>
> *            *            *
>
> P.S.  *You mentioned "transferring equipment" in your email. That's not part of the agreement as I understand it.  Raymat has no right to transfer the contract manufacturer's equipment in any event*.

Counsel for A&C Catalysts replied in pertinent part (TX 211) (emphasis added):

> To address your P.S. — I believe through the discussions at the conference and settlement terms refers to manufacturing process which in our client's mind *included the equipment needed to process LL to make it a turn key operation*.  $150,000 is an extreme sum to pay just for documents and 8 hours of consult.

19.     That day, counsel for Raymat sent counsel for A&C Catalysts the following email, dated August 25, 2014 (TX 226):

5

**United States District Court**

For the Northern District of California

1
2
3

> Pursuant to the Settlement Agreement, Raymat hereby provide you as the eschrow [sic] the LL manufacture process in English and Chinese. Raymat expects to receive the payment of $150,000 by August 29, 2014, as required by the Settlement Agreement.

4

Attached to that email were (1) a document in Chinese and (2) a translation thereof in English

5

titled "The Manufacturing Process for LL (June, 2012)" ("Raymat's eleven-page process

6

description"). The Chinese version was the document given to the Yantai plant for manufacturing

7

LL. Dr. Lin, however, spent considerable time at the Yantai plant perfecting and adjusting the LL

8

manufacturing process. The eleven-page process description did not include every detail

9

(Dec. 16 Trial Tr. 219–20, 223, 231, 283–84).

10

        20.     Counsel for A&C Catalysts then sent counsel for Raymat a letter, dated August 27,

2014, which stated in relevant part (TX 201) (emphasis added):

11
12
13
14
15
16
17
18
19

> To date, counsel for A&C has only received from counsel for Raymat partial documentation of the process, which is being held by counsel in escrow. From counsel's brief review, this documentation appears to be an overview or "recipe" for the LL protocol. However, the agreement and the understanding between the parties was to transfer the complete manufacturing process, in order for A&C to produce LL immediately, thus the high value of $150,000 consideration was offered. Therefore, as the parties agreed at the settlement conference, and as the settlement conference transcript makes clear, in exchange for $150,000 Raymat is to provide (1) the manufacturing process, (2) documentation of that process, and (3) eight hours of consulting time. ***To date Raymat has delivered into escrow only partial "documentation of that process," item (2), but not the process equipment and technology necessary to make the manufacturing process useful to A&C.***

20
21

> Upon receipt of ***the complete manufacturing process — including equipment, technology, and all production documentation —*** A&C will release the funds from escrow . . . .

22

        21.     Counsel for Raymat then sent a three-page response letter, dated August 29, 2014,

23

which stated in pertinent part (TX 202) (emphasis added):

24
25

> Contrary to what you stated in your letter, ACC did not promise to pay $150,000 just for the documentation, but for ***the intellectual property (i.e., trade secrets and know-hows) of Raymat.***

26

                  *                      *                    *

27
28

6

> If your client had wanted to include the LL production line or any equipment thereof, your client could have easily added a sentence to make it clear.
>
> *          *          *
>
> As of now, Raymat has delivered its trade secrets and know-hows of LL manufacturing process to ACC's counsel.  Contrary to your baseless claim, ***the protocol that Raymat delivered is the only process description that Raymat has.  A competent chemical engineering plant should be able to implement the protocol to manufacture LL.  Raymat has no other documentation or information that can be disclosed to ACC regarding the LL manufacturing process*** . . . .

22. Counsel for A&C Catalysts then sent counsel for Raymat a letter, dated September 11, 2014, which stated in relevant part (TX 36):

> Even a brief review [of Raymat's eleven-page process description] concludes the document delivered is woefully inadequate — it lacks the most basic elements of standard manufacturing documentation.  Rather, the document appears to be "lab notes" or observations from viewing LL production.  Because the documentation does not even describe the equipment used, it is difficult to tell.  But certainly, this single document cannot possibly be considered to be the "documentation of the process" of a commercial scale operation.  Specifically, the document does not contain the following basic elements, which any manufacturer would have:
>
> •          Equipment Lists
>
> •          Batch Sheets
>
> •          Raw material specifications and sourcing details
>
> •          Quality Control testing results and test methods
>
> •          Standard Operating Procedures for manufacture of LL
>
> •          A schematic of the LL production layout

23. The same day, A&C Catalysts commenced the instant action against Raymat, alleging breach of the settlement agreement, intentional misrepresentation, false promise, and declaratory judgment.  Raymat filed a counterclaim against A&C Catalysts, alleging breach of the settlement agreement and fraud.

24. Counsel for Raymat also sent a six-page response letter, dated September 23, 2014, which argued that what A&C Catalysts called the "basic elements" (with one exception) were "not inherent" to a manufacturing process and were "merely documents that are derived

7

**United States District Court**
For the Northern District of California

1    from the manufacturing process" (TX 37).  The one exception was that, in Raymat's view, the

2    "standard operating procedures" had been disclosed in the eleven-page process description.

3           25.     At the initial case management conference, the undersigned judge tried to grasp

4    how the recent settlement agreement had fallen apart so quickly.  Counsel for A&C Catalysts

5    stated that the phrase "LL manufacturing process" encompassed equipment

6    (TX 139, Nov. 12 Tr. 14–15):

7           Court:        Are you [A&C Catalysts] saying that they
                          [Raymat] were supposed to turn over equipment,
8                         like a vat or a giant mixer or tubing, and that they
                          — Raymat — had to turn that kind of stuff over?
9
            A&C:         Your Honor, depending on the specialization.
10
            Court:        Can you say "Yes" or "No"?
11
            A&C:         Of the equipment, yes, Your Honor.  They were
12                        given three months to turn over the manufacturing
                          process.  We assumed it would be the equipment
13                        and all of the technology, such that A&C could, in
                          its plant, install the process, and start making the
14                        chemical.  That's what they were purchasing.

15          Court:        But they say the process just means the IP part —
                          the way to do it —  not the equipment.
16
            A&C:         Correct.  And not only that, but they also say that
17                        they don't even have that IP, or they don't — the
                          batch sheets, the other — the schematic of the
18                        plant, the equipment list.  They say everything is in
                          the possession of Yantai, so we can't give you
19                        anything.  All you get for [$] 150,000 is one
                          document that just describes the process, and
20                        doesn't even provide any assurances that that's the
                          actual process that they were using . . . .
21
            26.     A&C Catalysts' pretrial briefs, dated December 1, 2014, continued to argue that
22
     "specialized equipment" was required by the settlement agreement (Dkt. Nos. 49, 52).
23
            27.     A three-day bench trial occurred from December 15 through 17, 2014.
24

25

26

27

28

8

1   A&C Catalysts called Dr. David Dodds (expert witness), Dr. Gary Huvard (expert witness),

2   Abraham Goldstein, and John Wolfe.  Raymat called Dr. Jibing Lin, Jim Turner, and Dr. Walter

3   Goldstein (expert witness).[*]

4        28.     Since May 2014 (when the settlement agreement was entered), A&C Catalysts has

5   been able to meet its LL orders based on existing inventory.  Raymat, however, has not requested

6   that the Yantai plant provide any of the "production records" requested by A&C Catalysts.

7        29.     All further findings will be included with the analysis and conclusions of law.

8                        **ANALYSIS AND CONCLUSIONS OF LAW**

9        30.     In resolving this dispute, the Court has relied on the actual words used in the

10  express settlement agreement and consulted all of its terms, for what light they may shed, on the

11  terms now in dispute.  As to words found to be ambiguous, the Court has further considered the

12  actual communications between the parties leading up to the settlement agreement and viewed

13  them in the way reasonable parties in the same circumstances would have understood them.

14  The parties agree that California law applies.

15       31.     While industry custom has some relevance, the true test in our case is how

16  reasonable parties in similar circumstances, knowing what they knew leading up to the

17  agreement, would have understood the term "LL manufacturing process" to mean as used in the

18  settlement agreement placed on the record.  Undisclosed "understandings" do not count for much.

19       32.     Here are the key provisions of the three-page settlement agreement read into the

20  record (TX 20) (emphasis added):

> Raymat and Doctor Lin agree to leave the LL business entirely and
> worldwide for a period of ten years.  Raymat and Doctor Lin cannot
> operate LL business through any subsidiary or shadow company
> during that time, including but not limited to, working with the
> Yantai plant to produce LL, or to introduce anyone to the LL
> business using the Yantai plant.

[*] After the bench trial, findings of fact and conclusions of law, and responses, were proposed by both sides.  Rather than merely vet each finding and conclusion proposed by the parties, this order navigates its own course through the evidence and arguments, although many of the proposals have found their way into this order.  Any proposal that has been expressly agreed to by the opposing side at least in part, however, shall be deemed adopted (to the extent agreed upon), even if not expressly adopted herein.  It is unnecessary for this order to cite the record for all of the findings herein.  Only those citations to particulars that may assist the court of appeals have been provided.  All declarative statements herein are factual findings.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

4

> Raymat and Doctor Lin cannot disclose the ***LL manufacturing process*** to anyone during this ten-year period, except for ACC. If Raymat or Doctor Lin violate the ten-year ban, then ACC can sue them for breach of contract with a liquidated damage clause of $2,000,000.  If such a breach of contract is pursued, the prevailing party shall be entitled to seek reasonable attorney's fees.

5

> *                    *                    *

6

7

8

9

> In addition [to purchasing inventory], ***ACC will pay $150,000 to Raymat to purchase Raymat's LL manufacturing process, along with documentation of that process, in both English and Chinese***, as well as eight hours of support time for teleconferencing with Doctor Lin.  The manufacturing process will be provided to ACC by no later than August 29th, 2014 and ACC will pay Raymat the $150,000 by no later than August 29th, 2014.

10

The dispute thus boils down to what "LL manufacturing process, along with documentation of

11

that process" means.  Noticeably absent from the settlement agreement was the word "all" before

12

the phrase "documentation of that process."

13

33.    This order finds that reasonable parties in similar circumstances using similar

14

language would have understood that Raymat promised to provide A&C Catalysts a written

15

description of the LL manufacturing process actually used at the Yantai plant in China in

16

sufficient detail that it could be duplicated at A&C Catalysts' plant in New Jersey.  Raymat's

17

eleven-page process description did not include all details known to the Yantai personnel and it is

18

clear that at least some of those details known by the Yantai plant should have been provided to

19

A&C Catalysts.

20

34.    Every single detail, however, was not required so long as (1) the detail would have

21

been obvious and clear cut to those skilled in this trade, *i.e.*, not left to guesswork or

22

experimentation; (2) the detail was obviously so non-critical that modest variations would have

23

made no material difference; *or* (3) the detail was a mere clarification of the type that could

24

reasonably have been expected to be answered in the eight hours of teleconferencing time with

25

Dr. Lin.

26

35.    Indeed, the eight hours of teleconferencing time with Dr. Lin shows that the parties

27

understood that the description would still leave some questions unanswered and that verbal input

from Dr. Lin would be needed to fill in the blanks (Dec. 16 Trial Tr. 237–38).

28

10

United States District Court
For the Northern District of California

36.     Although Raymat turned over all documents in its possession that summarized or described the LL manufacturing process, Raymat was wrong to insist that its promise was limited to only extant documents in its actual possession.  For example, Raymat argued in this satellite litigation (Dkt. No. 65 at 7) (emphasis added):

> The settlement agreement only says that A&C agreed "to purchase Raymat's LL manufacturing process, along with documentation of that process."  ***The most direct interpretation is that the purchase was for whatever that [sic] Raymat has.***  There is no guarantee as to the quality of the manufacturing process or the amount of the details contained in the "documentation."  It included 8 hours of free consultation designed for filling in details that may be lacking in the preexisting documentation.  ***The Settlement Agreement certainly does not require Raymat to generate a report as part of the "documentation."***

This contention is rejected.  The promise made by Raymat was *not* a response to a Rule 34 document request.  It was a promise in a contract.  Raymat was obliged to provide the promised information even if it had to take steps to obtain it and to reduce it to writing, including, as necessary, to obtain the required information from its contract manufacturer, the Yantai plant.  Raymat was obliged to eliminate all guesswork as to the actual process at the Yantai plant, save and except for items described in paragraph 34 above.

37.     On the other hand, and contrary to A&C Catalysts, Raymat was not required to go to Yantai, China and collect every record relating to LL.  Raymat was, however, obliged to obtain from the Yantai plant any documents and information needed to fulfill its promise.  A&C Catalysts was reasonable in presuming that Raymat had a contractual right to obtain such materials and information from the Yantai plant, but if Raymat had earlier neglected to obtain such a right of access, that neglect was and must remain Raymat's problem.  The fact that Raymat had no ownership in the Yantai plant did not relieve Raymat of its promise in the settlement agreement.  It was reasonable for A&C Catalysts to expect that Raymat was in a position to obtain the required information from the Yantai plant by virtue of Raymat's pre-existing relationship with the Yantai plant, including any contractual duty of the contract manufacturer to supply information to its customer.  (Raymat's president testified at trial that he was still able to obtain information from the Yantai plant (Dec. 16 Trial Tr. 247, 265, 267).)  Indeed, in the chemical manufacturing industry, unless otherwise specified by contract, the company that hires a

1    contract manufacturer typically has access to some production documentation for the contracted

2    manufacturing process.

3           38.     This order rejects Raymat's patent analogy.  That is, Raymat contends that its

4    eleven-page process description should be treated like a high-level specification in a patent and

5    all details of implementation should be left to the imagination of those having ordinary skill in the

6    art.  A&C Catalysts, however, bought a very specific process — the LL manufacturing process

7    actually used at the Yantai plant — not a potpourri of potential ways of manufacturing LL.  A

8    patent specification is usually more general and leaves some details to the imagination of those

9    skilled in the art.  The promise made here, however, was to describe a very particular process

10   actually used at a specific plant.

11          39.     This order rejects Raymat's contention that it only needed to disclose its own

12   "trade-secret" improvements over the Ajinomoto patent.  To the contrary, Raymat agreed to

13   disclose the full A-to-Z process, save for the minor details referenced above in paragraph 34.

14          40.     This order also rejects Raymat's contention that the non-disclosure clause (with its

15   two million dollar penalty) somehow limited Raymat's promise to simply revealing those parts of

16   the LL manufacturing process that Raymat decided were "trade secrets."  That would have been

17   an illusory promise, leaving Raymat free to whittle down its disclosure to a few limited nuggets.

18   The real purpose of the non-disclosure clause was to prevent Raymat and Dr. Lin from going out

19   and cranking up a new LL factory or selling the process to someone else who would then compete

20   with A&C Catalysts.  In other words, one purpose of this agreement was to suppress LL

21   competition from Raymat, directly or indirectly.

22          41.     This order recognizes that some details might (or might not) be filled in by the

23   Ajinomoto patent but A&C Catalysts should not be forced to engage in mix-and-match

24   guesswork, especially since Raymat admits its own process had "secret" improvements over the

25   patented process as to color, yield, and smell.

26          42.     This order further rejects Raymat's contention that the blanks can be filled in by

27   trial and error so long as the extent thereof is not "undue experimentation."  A&C Catalysts

28   should not have to resort to filling in the blanks through trial and error.  If the missing information

United States District Court
For the Northern District of California

12

United States District Court

For the Northern District of California

1  is clearly obvious, it need not be provided, but non-obvious specifics discovered by Raymat and

2  used at the Yantai plant were obliged to be disclosed.

3         43.     Contrary to Raymat, the discussion between A&C Catalysts and Raymat during

4  the settlement negotiation about introducing A&C Catalysts to the Yantai plant — which was *not*

5  expressed in the settlement agreement — did not replace Raymat's express promise in the

6  settlement agreement to supply the required information.

7         44.     This order rejects Raymat's contention that it was excused from performance

8  merely because A&C Catalysts' counsel wrongfully demanded physical equipment in their emails

9  prior to the latest lawsuit.

10        45.     To be sure, A&C Catalysts was wrong, in its emails prior to the latest suit, to

11  contend that Raymat promised to provide physical equipment from China.  This order further

12  rejects A&C Catalysts' contention that A&C bought a "turn-key" operation.  The settlement

13  agreement called out "inventory" and "process," but it did not call out "equipment."  Although in

14  the trial, A&C Catalysts backed off these contentions (after the judge earlier questioned the

15  legitimacy of these contentions at the final pretrial conference), there is no doubt that A&C

16  Catalysts' overreaching demand for a "turn-key" operation and physical equipment (in China and

17  not owned by Raymat) was a material factor leading to this satellite litigation.  (So was Raymat's

18  obstinate position.)

19        46.     This order rejects A&C Catalysts' further contention that Raymat's eleven-page

20  process description is "not a useful document."  To the contrary, this order finds that the

21  document describes the LL manufacturing process in meaningful and sincere ways — even

22  though it falls short in certain other ways.

23        47.     In sophisticated purchases between large companies, the contracts often expressly

24  call for a long list of disclosures, lists, and diagrams, and such items are typically provided at

25  closings.  This practice is not very relevant here because we have a pithy three-page settlement

26  agreement in which much, much less was specified — only the phrase "LL manufacturing

27  process" was used.  A&C Catalysts' argument that the entirety of sophisticated practices in more

28

1  sophisticated deals should be shoe-horned into the tiny passage used in this settlement agreement

2  is rejected.

3        48.     A&C Catalysts has been too hypercritical of Raymat's eleven-page process

4  description (TX 8).  For example, A&C Catalysts' experts testified that they could not tell what

5  kind of purified water was required, what "low speed" meant, what type of centrifuge was used,

6  how many storage tanks were needed, and so forth.  Had A&C Catalysts taken advantage of the

7  eight hours of teleconferencing time with Dr. Lin, it would have learned almost all of the details it

8  now contends are missing.  A&C Catalysts should have taken advantage of the eight hours of

9  teleconferencing time to fill in the alleged missing details before filing this lawsuit.  There is a

10  very good chance that most, if not all, questions could have been answered.  Dr. Lin has extensive

11  personal knowledge of how the LL manufacturing process at the Yantai plant worked (Dec. 16

12  Trial Tr. 223, 241–46).

13        49.     This order rejects A&C Catalysts' position that the stoichiometry and the

14  underlying chemical equations behind each step had to be spelled out.  Indeed, the president of

15  A&C Catalysts testified that he showed the Ajinomoto patents and the "chemistry behind LL" to

16  Raymat (Dec. 15 Trial Tr. 77, 138).  If the specified steps in the LL manufacturing process would

17  result in the LL described, then the interim chemical equations would be superfluous.

18        50.     This order further rejects A&C Catalysts' proposition that the "environmental"

19  documents and the thousands of pages of "batch documents" had to be provided — except to the

20  limited extent, if at all, that their contents would be needed to supply the required process

21  information referenced above.  Nor was a high-level flow diagram required so long as the

22  materials provided described the flow of steps.  A&C Catalysts' contention to the contrary is

23  rejected.

24        51.     This order recognizes that the experts retained by A&C Catalysts testified to a long

25  "shopping list" of diagrams and lists that should have been supplied.  The Court has discounted

26  some of this testimony in view of the bias of these paid witnesses, one of whom candidly

27  admitted that, as a hired expert, he was a "mercenary" (his term).

28

United States District Court
For the Northern District of California

14

United States District Court

For the Northern District of California

52.     This order finds that A&C Catalysts knew that the Yantai plant was a contract manufacturer for Raymat and that the Yantai plant was separate from Raymat (even though A&C Catalysts may not have known the particulars of the relationship).  In turn, A&C Catalysts knew that at least some documentation in Yantai might be impractical for Raymat to obtain and that Raymat would only use good faith efforts to obtain documents from the Yantai plant.  Again, the eight hours of teleconferencing time would likely have answered questions even though unproduced documents in Yantai also might have answered them.

53.     No damages have been proven.  Contrary to A&C Catalysts' demand for $340,000, there is no evidence in the record supporting that amount or any amount of specific, non-speculative damages.  Contrary to Raymat's demand for an unspecified amount of compensatory damages in the form of "unjust enrichment" and "up to $1 million dollars of punitive damages," as stated in its pre-trial brief, nothing in the record supports this demand.  This order notes that in its post-trial proposal, Raymat sought only $150,000 plus interest.  No monetary relief will be provided other than that stated in the order for relief herein.  Fees and costs shall be decided, if appropriate, pursuant to the schedule set forth in Civil Local Rule 54.

### ORDER FOR RELIEF

A.      To the extent stated below, this order finds that Raymat's eleven-page process description (TX 8) was inadequate to meet Raymat's obligation under the settlement agreement and hereby orders Raymat to supply on or before **JANUARY 30, 2015**, the following:

1.     A list of equipment actually used in the Yantai plant for the LL manufacturing process, setting forth the key specifications of the equipment.  (If the equipment make and model numbers are available, that will suffice.)  Specialized equipment must be described in greater and sufficient detail to allow duplication.

2.     One or more diagrams that show how equipment items were interconnected at various stages in the process.

3.     A list of raw material specifications and purity actually used at Yantai.

4.     If analytical tests and samples were taken along the way by the Yantai plant, then those must be described.  If there were none, that must be stated.

5.     All precautions taken in the LL manufacturing process at Yantai for health and safety reasons must be described.  If there were none, that must be stated.

15

1  All of this information must be provided to A&C Catalysts by **JANUARY 30, 2015**.  The $150,000

2  required by the settlement agreement will remain in escrow pending further order.

3          B.          At least two weeks before seeking teleconferencing support from Dr. Lin, A&C

4  Catalysts must email Dr. Lin a list of specific questions sought to be discussed during the session.

5  The list must be limited to ten questions per hour of teleconferencing time.  It shall be no

6  objection to answering that the information requested is obvious.  If Dr. Lin does not know the

7  answer, he should say so rather than guess.  The teleconference must be completed by

8  **FEBRUARY 20, 2015**.  It shall be recorded in video and sound.

9          C.          By **FEBRUARY 24, 2015 AT NOON**, both sides shall file a joint statement advising

10  whether there is any disagreement concerning compliance and stating the specifics of any

11  disagreement.  If there is any disagreement, the parties shall also jointly provide the names of two

12  qualified expert witnesses possibly to be appointed under Rule 706 of the Federal Rules of

13  Evidence and/or Rule 53 of the Federal Rules of Civil Procedure to assist the Court in resolving

14  the dispute with the expense of the witness/master to be borne by the parties in proportion to their

15  culpability.  Please do not communicate, directly or indirectly, with any such nominee except that

16  both counsel shall contact the two nominees by joint telephone conference to ascertain their

17  availability and to check for conflicts.  Do not advise the Court or the nominee as to which side

18  suggested their names except that, if there is any objection by one side to the other side's

19  nominee, that objection may be made to the Court.

20          D.          Except as allowed herein, A&C Catalysts is hereby enjoined from using the

21  information in Raymat's eleven-page process description in any way pending further order.

22                          *                          *                          *

23          Finally, the agreement in question includes an agreement not to compete for ten years.

24  (This followed an earlier exclusive supply agreement that cratered and led to the original lawsuit.)

25  *Given the limited number of manufacturers of LL in the world and in view of the exclusion of*

26  *Raymat from the LL business for ten years under the settlement agreement in question, this order*

27  *now states that in no way does the Court bless or immunize the agreement from liability under the*

28  *Sherman Act*.  The parties shall not pretend or otherwise represent to others that the Court in any

United States District Court
For the Northern District of California

1   way blessed this agreement not to compete.  Because of the possibility that this agreement

2   unlawfully restrains and suppresses competition, the Clerk shall forward a copy of this order to

3   the Antitrust Division of the Department of Justice.  Both sides shall preserve all evidence in the

4   event that the Justice Department asks to review it.  Nevertheless, nothing in this paragraph

5   modifies the relief ordered above.

6

7       **IT IS SO ORDERED.**

8

9   Dated:   December 30, 2014.



10                                            WILLIAM ALSUP
                                             UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California